Rosalind **FOGEL** and Gerald Fogel, Plaintiffs,

v.

George A. **CHESTNUTT**, Jr., et al., Defendants.

No. 68 Civ. 2855.

United States District Court, S. D. New York.

Oct. 29, 1974.

Pomerantz, Levy, Haudek & Block, New York City, for plaintiffs; Richard

M. Meyer, Daniel W. Krasner, New York City, of counsel.

Rogers, Hoge & Hills, New York City, for defendants Chestnutt, Jr., Currier, Sabel, Greene, Chestnutt Corp., and American Investors Corp.; Clendon H. Lee, Frederick A. Nicoll, New York City, of counsel.

Rogers & Wells, New York City, for American Investors Fund, defendant; William F. Koegel, New York City, of counsel.

WYATT, District Judge.

This is the decision after trial without a jury on the issue of liability alone. There will be judgment for defendants on this issue.

Plaintiffs are and have been since January 11, 1963 holders of record of shares of capital stock of American Investors Fund, Inc. (Fund), a New York corporation. Fund is a diversified open-end management investment company registered as such under the Investment Company Act of 1940 (15 U.S.C. § 80a-1 and following ("the 1940 Act"); see §§ 80a-3, 80a-4, 80a-5, 80a-8). Fund is one of the many companies usually called a "mutual fund". Fund does not charge a "sales load" (commission) on its shares sold (15 U.S.C. §§ 80a-2(a) (35), 80a-10(d).

Fund was organized in 1957 and had for some time as its investment adviser, American Investors Corporation. Since July 19, 1966, the investment adviser of Fund has been Chestnutt Corporation (Adviser), a Connecticut corporation which acquired all the assets of American Investors Corporation. For simplicity the term "Adviser" will usually be meant to include American Investors Corporation. The Adviser manages Fund and acts under an investment advisory contract between it and Fund.

George A Chestnutt, Jr. (George), for whom the Adviser is named, is president and principal stockholder (47%) of the Adviser and president and a director of Fund. He has been the chief figure in Fund and in the Adviser.

The action was commenced on July 11, 1968, and is a derivative one on behalf of Fund (a nominal defendant). The action is also said to be brought "representatively" for all other "shareholders of the Fund similarly situated"; what this means is not clear.

The named defendants are the Advisor, its predecessor (American Investors Corporation) and the seven directors of Fund when the action was commenced. Four of these individual defendants were served and defended: George, Currier, Greene, and Sabel. Currier is a director of Fund and owns voting common stock (2%) of the Adviser; he is a corporate executive in the women's wear field. Greene is vice president and a director of Fund and vice president and a small stockholder (0.4%) of the Adviser. Sabel is a lawyer and a director of Fund; before his retirement in 1971, Sabel was senior vice president and secretary of Fund and was also vice president, secretary, director, and substantial stockholder (16%) of the Adviser (he may still be a substantial stockholder of the Adviser).

The complaint named three other directors of Fund who were not served and did not appear: Fowler, Radcliffe, and Veeder.

Jury trial was demanded by plaintiffs.

The complaint in one count avers a claim that the Adviser and the individual defendants enriched themselves at the expense of Fund by the use of "reciprocal brokerage" and "give-ups". Specifically, the charge is that defendants violated the 1940 Act "by failing to recapture brokerage commissions for the Fund" (Post-Trial memo for plaintiffs, p. 2).

The complaint avers that this Court has jurisdiction under the 1940 Act and also under the Investment Advisers Act of 1940 (15 U.S.C. § 80b-1 and following) and the Securities Exchange Act of 1934 (15 U.S.C. § 78a and following; "the 1934 Act"). Plaintiffs appear to rely solely on the 1940 Act.

By order filed June 29, 1973, it was directed that "the issue of liability will be tried separately and before the issue of damages". The Court was advised at that time that the action would be tried without a jury.

A pretrial order signed September 4, 1973 (but for some reason not filed until October 4, 1973) noted that the right to a jury trial had been waived by "both parties".

Without opposition by defendants, the plaintiffs were permitted to serve and file a supplemental complaint, the principal (if not only) function of which was to bring the complaint down to date. The supplemental complaint was filed on August 24, 1973 (a copy with verification added was filed on August 30, 1973). No order was made that defendants plead to the supplemental complaint (Fed.R. Civ.P. 15(d)); note was taken of this situation at trial and new paragraphs of the supplemental complaint were "deemed denied" (SM 6; SM references are to pages of the stenographic minutes).

It is difficult to tell the time period for which this action is brought. Based on the averments in paragraphs 21(a) and 23(a) of the supplemental complaint, it would appear to be from January 1, 1965 down to date. For reasons which will appear, however, the claim as to give-ups must end on December 5, 1968, and the claim as to reciprocal brokerage must end on July 15, 1973. Counsel for plaintiffs insist (SM 65) that membership on two regional exchanges would have yielded preferences thereafter, but, as will appear, SEC Rule 19b–2 prohibited this, effective March 15, 1973.

### 1.

Since 1964, Fund has had either eight or seven directors.

With respect to directors, the parties have used the terms "affiliated" and "unaffiliated" but have not defined these terms. The 1940 Act uses the expression "interested persons" in referring to directors (15 U.S.C. § 80a–10(a)) which is elsewhere defined to include an "affiliated person" (15 U.S.C. § 80a–2(a) (19)(A)(i)) which latter term is elsewhere defined (15 U.S.C. § 80a–2(a) (3)). For purposes of this action, an affiliated director may be considered as one connected with or having an interest in Advisor, as opposed to an independent director, having no connection with or interest in Adviser.

Since 1964, Fund has had either three independent directors out of seven or four independent directors out of eight. Fund has had four affiliated directors. Currier is counted as an affiliated director because, while not employed by Advisor, he has owned 2% of the voting common stock of Adviser.

Fund and Adviser had the same counsel. Sabel and his firm were counsel to both until 1971 or 1972. Clendon H. Lee, whose wife has been for a long time the owner of a small amount (1%) of the voting common stock of Adviser, became special counsel to Fund in 1965 and his law firm has acted as counsel to Fund since at least April 28, 1972.

Under the investment advisory contract, Adviser manages and advises Fund, furnishes all offices to Fund, pays all officers and employees of Fund, and in short does everything for Fund.

Fund pays nothing for expenses except fees to directors.

Under the investment advisory contract, Fund pays the Adviser for its services on an annual rate of a percentage of the net asset value of Fund. These payments have been substantial, ranging from $187,000 in 1964 to $1,557,-000 in 1969.

### 2.

The charges in this action had their origin in the size of the transactions made on stock exchanges by mutual funds and other institutions. As these transactions developed, they involved buying and selling large blocks of shares and at the rates fixed by the exchanges (no quantity discounts) the brokerage commissions became so great that members of the exchanges could execute fund

transactions at a cost of only a small part of the commissions which had to be charged. Naturally, exchange members were eager for mutual fund business and would have been willing to rebate part of their commissions to the customer mutual funds but were prevented by exchange rules from doing so.

In this climate, brokers had a strong motive to give help to managers of mutual funds by (a) selling shares of the fund or (b) supplying the manager with investment research and advice, or (c) doing both. The manager of the mutual fund would then allocate part of its brokerage business to such helpful brokers, and could see that the commissions earned by such helpful brokers bore a relation to the value of the sales efforts and of the research and advice. Those allocated orders were known as "reciprocals".

For some funds, especially big funds, it became undesirable to allocate brokerage orders on the basis of the value of non-brokerage services rendered. This was principally because sales of the mutual fund shares were made by many independent brokers or dealers; to send brokerage transactions through so many brokers would not be prudent from a management standpoint, this for many good reasons.

To meet this situation, the brokers and mutual fund managers worked out the technique of the "give-up".

The give-up technique was that the broker who executed the fund transaction surrendered a part of his commission to other brokers designated by the customer fund, acting of necessity through the fund manager. In this way, the fund manager could spread the commissions on fund executions among a number of brokers, who, although they had nothing to do with execution of the transaction, had been otherwise helpful in selling fund shares or in giving investment advice or both.

Brokers executing transactions for mutual funds were willing to give up as much as 75% or more of their commissions.

As might be expected, the Securities and Exchange Commission (SEC) became concerned with the influence of fund and other institutional transactions on the structure of the market for securities, as well as with the fixed rates (without quantity discounts) charged under exchange rules. It was this last feature which had resulted in the development of reciprocals and give-ups.

The give-up technique was not without its limits. Because of a rule of the New York Stock Exchange (NYSE), commissions on transactions there could only be given up to other members of that exchange. The regional exchanges, as a way of competing with NYSE, were less strict. Nearly all the regional exchanges permitted commissions to be given up to non-members provided they were members of National Association of Securities Dealers, Inc. (NASD).

NASD is the only "national securities association" registered with the SEC under Section 15A of the 1934 Act (15 U.S.C. § 78o–3; the Maloney Act (added in 1938)), the purpose of which was to establish supervised self-regulation of over-the-counter brokers and dealers. NASD has rule-making power.

The availability of give-ups posed a dilemma for fund managers. The business was that of the funds; the fund was the customer. But exchange rules prevented any rebate on the fixed commissions to the customer. Rather than leave all the commissions with the executing brokers, the fund manager directed give-ups to those brokers who sold fund shares. True, as plaintiffs argue, this benefited the fund manager because it rewarded brokers who sold fund shares, who thus increased the assets of the fund, and who thus enabled advisory fees to increase. But it did no harm to the fund because (by definition) the fund could in no event secure a rebate. In point of fact, there was some benefit to the fund stockholders from the increase in fund assets by sale of more

shares; advisory fees usually, if not always, go down on a sliding scale of ascending asset value (such was the case with Fund here).

Some fund managers, however, sought to secure a benefit to their funds by recapturing for them a part of the excess commissions available as give-ups. This was done beginning in 1965 by use of a broker-dealer affiliate who was a member of NASD, as, for example, the underwriter who sold shares of a "load" fund on a commission basis and whose qualification to be a member of NASD was clear. In at least a few instances, the fund managers created a broker-dealer subsidiary which became a member of a regional exchange. By these means, some of the commissions on portfolio transactions were used to reduce the advisory fees of the fund managers.

The concern of the SEC with fixed commission rates (without quantity discounts on large transactions) included a concern with the give-up technique. These concerns in 1968 led to discussions between the SEC and NYSE; as a result of pressure from the SEC, give-ups on NYSE were prohibited by its rules after December 5, 1968. In response to the same pressure, all the regional exchanges prohibited give-ups at the same time.

Reciprocals could not be used after July 15, 1973, because a Rule of NASD effective that date prohibited them. (The Rule was adopted by NASD after the SEC had publicly stated that "reciprocal practices must be terminated" for a number of reasons given in the statement; see SEC Policy Statement, February 4, 1972.)

In its continuing study of the securities business, the SEC took note of the use by some fund managers of membership in regional exchanges as a means of securing give-ups or otherwise to recapture commissions. The SEC found this to be against the public interest and on this account and for other reasons, effective March 15, 1973, the SEC adopted Rule 19b–2 under the 1934 Act. This Rule required that each member of a national securities exchange must have "as the principal purpose of its membership the conduct of a *public* securities business" (emphasis supplied), which was defined to mean that 80% in value of its exchange transactions had to be for persons not affiliated. The effect of this Rule was to make it impossible for investment companies to recapture any part of their commissions through the use of broker affiliates (unless such affiliate did 80% of its business with persons independent of the investment company, that is, was truly a "public" broker).

The SEC took note at the time (Release No. 9950, January 16, 1973, section VII(A)):

"On the regional exchanges many subsidiaries of investment managers and insurance companies have purchased seats to trade for the account of the affiliated 'parent' or to be used for 'recapture' of commission dollars for that parent."

One of the principal reasons given for the adoption of Rule 19b–2 was a finding by the SEC that "membership [in an exchange] utilized primarily . . . for the purpose of . . . recapturing commissions charged on exchange securities transactions, directly or indirectly, is inimical to the protection of investors, fair dealing in securities traded in upon such exchanges, the fair administration of such exchanges and the interests of the public investors we are mandated to protect in the development of a central market system for listed securities." SEC Release No. 9950, January 16, 1973, Introduction.

It may be mentioned that Rule 19b–2 has been attacked by a regional exchange; its appeal to a court was dismissed for lack of jurisdiction, without reaching the merits. PBW Stock Exchange, Inc. v. SEC, 485 F.2d 718 (3d Cir. 1973), cert. denied 416 U.S. 969, 94 S.Ct. 1992, 40 L.Ed.2d 558 (1974).

3.

The Adviser and those interested in it—chiefly George—managed and con-

trolled the Fund. If there were a conflict in interest between the Fund and the Adviser, the economic interest of the chief personalities would be with Adviser. In a general sense, however, what was good for the Fund was good for the Adviser, that is, the more successful and the larger the Fund became, the greater would be the advisory fee to Adviser.

In the matter of reciprocals and give-ups, there is no question but that the Adviser, acting for Fund, directed reciprocals and give-ups to brokers who sold Fund shares or who gave research material to the Adviser or both. To what extent this was done is difficult to say. According to the records, all brokerage commissions were so treated. For example, in the prospectus of Fund dated May 1, 1968 (Ex. 11) it was stated that all brokerage commissions were paid either to "brokers who provided helpful information" or to brokers "in connection with the sale of Fund shares". In his testimony, George suggested that records for the SEC required such allocation to be made. In any event, it is clear that the Adviser directed substantial amounts of reciprocals and give-ups. The Adviser used give-ups to reward brokers who sold Fund shares, seeing to it that they got in earned commissions or give-ups at least 2% and usually more of the amount of Fund shares sold by them. Discovery into the specific amounts of give-ups was not permitted (because related to liability) but it is known that there were $326,120 in give-ups in 1967 and $633,095 in 1968. Nearly all the transactions for Fund were on NYSE but a "small percentage" was on regional exchanges (SM 286). It is known that there were $205,000 in give-ups on regional exchanges between October 1966 and November 1968.

The use of reciprocals and give-ups was fully disclosed in the prospectuses of Fund.

Mutual funds may sell their shares in a number of different ways. Some use an underwriter who buys at wholesale from the fund and sells at retail either through an internal sales force or through independent broker-dealers who are paid a commission. Others, the no-load funds—such as Fund here—sell direct to investors or through independent broker-dealers who are not paid a commission. The use of give-ups supplied a motive to brokers for selling Fund shares; since no commission was paid on such sales, give-ups (or reciprocals) were the only reward to the brokers.

The use of give-ups and reciprocals did benefit the Adviser. Their use also benefited the Fund and its stockholders because the larger the Fund, the smaller the expenses of Fund would be per dollar of invested assets.

■ The use of reciprocals and give-ups did not cause any damage to Fund unless plaintiffs can establish that they, or a part of them, could have been recovered for the benefit of Fund.

### 4.

■ Under the theory of the case for plaintiffs, it is necessary for them to show that Fund or Adviser could have formed a subsidiary which could have properly become a member of NASD. While this is a hypothetical matter, it can be determined because the qualifications for NASD membership are in evidence (Ex. 21).

Counsel for plaintiffs insist that a subsidiary of Fund or Adviser could be a "broker" and be eligible for NASD membership; that obtaining membership would be "routine". Counsel for plaintiffs do not argue that such a subsidiary should do business with the public in competition with other brokers nor that the subsidiary should execute any transactions for Fund. The argument is that the subsidiary could secure NASD membership solely to qualify for give-ups and other preferences on regional exchanges. See Post-Trial Memorandum for plaintiffs pp. 19–41

Counsel for defendants ignore this issue and offer no help to the Court. It remains a responsibility of the Court

to reach a just determination of the issue.

It is concluded that such a specially created subsidiary of Fund or Adviser would not be eligible for membership in NASD.

The qualifications for NASD membership are in relevant part as follows (Ex. 21, p. 1049):

> "Any broker or dealer authorized to transact and whose regular course of business consists in actually transacting any branch of the investment banking or securities business in the United States, under the laws of any State and/or the laws of the United States, shall be eligible to membership in the Corporation . . .".

The definition of a "broker" is as follows (Ex. 21, p. 1059):

> "The term 'broker' means any individual, corporation, partnership, association, joint stock company, business trust, unincorporated organization or other legal entity engaged in the business of effecting transactions in securities for the account of others, but does not include a bank."

This definition is in substance that contained in the 1934 Act (15 U.S.C. § 78c (a)(4)).

A subsidiary such as plaintiffs suggest would not be "transacting any branch of the . . . securities business". It would not be "transacting" any "business"; it would simply be a device for securing a preference in commission rates for one investor over other investors. Nor would it be a "broker" since it would not be "effecting transactions in securities for the account of others". It would not be "effecting transactions in securities"; it would simply be receiving preferences. Nor would it be acting for the account of "others" (plural); the suggestion is that it act for Fund alone to qualify for preferences.

Neither the 1934 Act nor the NASD qualifications contemplate that such a device could be considered a "broker".

Counsel for the plaintiffs understandably rely on the testimony by deposition of general counsel to NASD (Ex. 20). This testimony is puzzling; it is not clear. At one point, the witness states that there is a "free entry policy" because "Anyone can become a broker-dealer under the 1934 Act who meets the statutory requirements". This Court agrees. If the witness means that such a subsidiary as plaintiffs suggest would be eligible for NASD, I disagree. True, had there been an application, NASD might have accepted the application. This would not have established eligibility but would have been an administrative failure of NASD. In any event, civil liability cannot be imposed for failure of defendants to do what it would have been deceptive and improper for them to do.

5.

■ The principle is accepted that defendants were under a duty by all proper means to secure for Fund the return of excess brokerage commissions. It is not shown that defendants could have properly secured any return for Fund.

Counsel for plaintiffs ably argue that there were three ways of doing this: (a) give-ups through the PBW Stock Exchange, (b) give-ups and discounts through the Pacific Coast Stock Exchange, and (c) tender offer fees. See Post-Trial Memorandum, pp. 24–30 All three depended, however, on membership in NASD and, as explained above, the suggested subsidiary would not be eligible for NASD membership.

In addition, counsel for plaintiffs argue (Post-Trial Memorandum, pp. 30–39) that there were advantages to membership by a new subsidiary in the PBW Stock Exchange. It is accepted that membership in PBW did not require membership in NASD (SM 57–58).

These advantages, if any, were obtainable only for the period prior to March 15, 1973, when Rule 19b–2 became effective. But to secure such advantages (assuming that there were some) would require defendants to pretend that the new subsidiary was a broker, when in fact

it was not, for the purpose of securing a preference over other investors by recapturing a part of the fixed commissions. While it may have been theoretically possible for PBW and the defendants, in collusion and for the selfish purposes of each, to accomplish such a result, it would have been contrary to public policy. The SEC found, as already noted, that to use membership in an exchange "for the purpose of . . . recapturing commissions . . . is inimical to . . . fair dealing in securities traded in upon such exchanges . . . .".

Civil liability can scarcely be imposed for failing to do what it would have been contrary to public policy for the defendants to do.

### 6.

Counsel for plaintiffs, with some reason, rely on Moses v. Burgin, 445 F.2d 369 (1st Cir. 1971), cert. denied 404 U.S. 994, 92 S.Ct. 532, 30 L.Ed.2d 547 (1971), and argue (Post-Trial Memorandum, p. 2) that "the issues and facts" in the case at bar are "virtually identical to the issues and facts" in *Moses*. The argument cannot be accepted.

Whether *Moses* was rightly decided is subject to some doubt and such doubt is permissible since the decision is not binding in this Circuit. It should be noted that *Moses* was decided in June, 1971, some time before the finding by the SEC that use of exchange memberships to recapture commissions was against public policy and before the adoption of Rule 19b–2. The *Moses* decision has not been applied in any action in this Circuit but has been discussed by Judge Gurfein in Weiss v. Chalker, 55 F.R.D. 168 (S.D.N.Y.1972) and 59 F.R.D. 533 (S.D.N.Y.1973). There is nothing. in Judge Gurfein's discussion which would suggest liability in the case at bar.

For present purposes, it is assumed that *Moses* reached the right result. It is not applicable here, however, because, while the situation in *Moses* is superficially similar to that in the case at bar,

the two situations on study are seen to be clearly distinguishable.

The fund in *Moses* was not (as here) a no—load fund. On the contrary it sold its shares to an underwriter (Crosby) which was a subsidiary of the adviser and which resold the shares through independent brokers and dealers who in turn resold to investor customers who paid a commission on the purchase. Crosby was a member of NASD.

Crosby was not only a member of NASD before the *Moses* litigation began but Crosby appears properly to have qualified for such membership. Crosby's qualification for NASD membership was accepted without question by all parties in *Moses* and by the Court of Appeals (see 445 F.2d at 375). While Crosby was not a "broker" and did not deal with the general public, it was a "dealer" because it bought the fund shares for its own account and resold them "to independent broker-dealers" (445 F.2d at 371). This fits the definition of "dealer" used by NASD (Ex. 21, p. 1059).

Counsel for plaintiffs in *Moses* are counsel for plaintiffs here. In *Moses* they argued that the fund could have recovered ("recaptured") part of the commissions paid on fund portfolio transactions,

(a) by creation of a broker affiliate, or

(b) by channeling give-ups to Crosby (a member of NASD) and having Crosby credit the fund on its advisory fee.

The District Court ruled (316 F.Supp. 31) that neither method of recapture was available.

The Court of Appeals ruled that there was no duty to recapture by creating a broker affiliate but that there was a duty to channel give-ups to Crosby.

The holding in *Moses* was that if recovery ("recapture") of give-ups was "freely available" to the fund there, its directors had a duty to recover them for the fund (445 F.2d at 374). The Court of Appeals found that some of the regional exchanges "permitted members of the National Association of Securities

Dealers (NASD) who were not exchange members . . . to receive customer-directed give-ups. Crosby was a member of NASD." (445 F.2d at 375)

It is not clear on what basis the Court in *Moses* held liable the adviser and the affiliated directors. At some points, it appears to be because there was a "failure to disclose" to the unaffiliated directors "the possibility of recapture" through Crosby's NASD membership (445 F.2d at 377, 383–84). But whatever the basis of liability may be, it must rest on a conclusion by the Court of Appeals that recapture was "freely available" in *Moses*. The conclusion is never expressly stated but it is implicit in the reasoning (see, for example, 445 F.2d at 384–85).

For the reasons already given, recapture was not "freely available" in the case at bar. Thus, the decision in Moses v. Burgin has no application.

The clerk is directed to enter judgment in favor of defendants, dismissing the action on the merits.

So Ordered.