Rosalind FOGEL and Gerald Fogel, Plaintiffs,

v.

George A. CHESTNUTT, Jr., John Currier, Frank G. Fowler, Jr., Warren K. Greene, Richard W. Radcliffe, Stanley L. Sabel, Francis L. Veeder, American Investors Corporation, American Investors Fund, Inc., Chestnutt Corp., Defendants.

No. 68 Civ. 2855.

United States District Court, S. D. New York.

June 19, 1980.

Pomerantz Levy Haudek & Block, New York City, for plaintiffs; Richard M. Meyer, New York City, of counsel.

Clendon H. Lee, New York City, for defendants Chestnutt, Jr., Currier, Sabel, Greene, Chestnutt Corp. and American Investors Corp.

Rogers & Wells, New York City, for American Investors Fund, Inc., defendant; William F. Koegel, New York City, of counsel.

WYATT, District Judge:

This is the decision on the issue of damages to be awarded against defendants Chestnutt Corporation, Chestnutt, Jr., Sabel, Greene, and Currier in favor of American Investors Fund, Inc. (the Fund) for whose benefit this derivative action was brought by the two Fund stockholders who are plaintiffs.

The action was tried to this Court without a jury on the issue of liability alone. There was a demand for a jury trial by plaintiffs but, assuming that a jury trial would have been required, all parties waived any right to a jury trial.

On October 29, 1974, this Court filed an opinion directing judgment for defendants, dismissing the action on the merits. 383 F.Supp. 914.

On December 30, 1975, the judgment of dismissal was reversed by the Court of Appeals. 533 F.2d 731 (2nd Cir.) Judge Friendly wrote a careful opinion for a unanimous Court. The defendants named first above were found liable to the Fund, guidance was given on the issue of damages, and the action was remanded for determination of damages. Certiorari was denied on October 4, 1976. 429 U.S. 824, 97 S.Ct. 77, 50 L.Ed.2d 86.

On October 27, 1976, an order of this Court was filed which referred the determination of damages to Honorable Sol Schreiber, then a United States Magistrate, who was asked "to file his report thereon with findings of fact and conclusions of law". Fed.R.Civ.P. 53.

Between January 18, 1977, and June 2, 1977, Magistrate Schreiber heard testimonial evidence, received other evidence, and listened to arguments.

On November 6, 1978, the report of the Master, dated October 31, 1978, was filed. That report, after explanations, findings and conclusions, determined that the damages were $349,013.04 plus interest.

On November 13, 1978, counsel for plaintiffs filed three documents:

   a.  "Objections to the Magistrate's Report";

   b.  "Memorandum in Support of Plaintiff's objections to the Magistrate's Report"; and

   c.  "Notice of Motion" for an order modifying the Master's Report and entering judgment accordingly.

On November 16, 1978, counsel for defendants served but did not file two documents:

   a.  "Defendants' Objections to the Magistrate's Report"; and

   b.  "Memorandum in Support of Defendants' Objections to the Magistrate's Report."

On November 20, 1978, counsel for defendants filed a document:

"Notice of Cross Motion and Suggestion". The cross motion was for an extension of time for the parties "to complete their presentation of facts and law to the Court."

On November 22, 1978, counsel for plaintiffs filed a document:

"Plaintiffs' Memorandum in Connection With the Magistrate's Report and in Opposition to Defendants' Cross Motion".

On February 6, 1979, there was a conference between Court and counsel; the conference was stenographically reported. Among other things, a time was fixed within which defendants could complete their papers dealing with the Master's Report.

Oral argument on that subject was set for March 2.

On February 20, 1979, counsel for defendants filed two documents:

a. "Notice of Motion" for an order modifying the Master's Report and directing entry of a judgment dismissing the Supplemental Complaint"; and

b. "Memorandum in Support of Motion to Modify Magistrate's Report and to Dismiss Complaint."

On March 2, 1979, counsel were heard in oral argument.

## 1.

Plaintiffs object to one portion of the Master's Report, that contained in Section IIIB of the Report where the Master finds that damages should not be awarded for failure to recapture "reciprocal brokerage and crosses".

Defendants object to each and every thing contained in the Master's Report, assert that no damages have been proved, and that the action should be dismissed on the merits. Defendants attempt to support their position, not by discussion of the evidence as to damages but by reargument of the matters decided by the Court of Appeals.

It is my duty to accept the opinion and decision of the Court of Appeals and, on the basis of the record made before the Master and with the help of his Report, to direct the entry of a correct judgment for money damages.

American Investors Fund, Inc. will be referred to herein as "the Fund". Chestnutt Corporation will be referred to herein as "the Adviser." The New York Stock Exchange will be referred to herein as "NYSE". American Stock Exchange will be referred to herein as "Amex". National Association of Securities Dealers, Inc. will be referred to herein as "NASD" (see 15 U.S.C. § 78o–3).

## 2.

The motion or suggestion or idea of the defendants that the action should be at this stage dismissed on the merits is rejected as without merit and is in all respects denied.

## 3.

This Court and the Court of Appeals were in agreement that the Adviser had a duty to recapture all excess brokerage and give-ups and all tender offer fees. This Court believed that no such recapture was possible. The Court of Appeals disagreed, holding that the Adviser or a subsidiary of the Adviser (often called an "affiliate") could and should have become a member of NASD. (For convenience, the term "Adviser" will often include a subsidiary or affiliate of the Adviser.) The Court of Appeals also held that the Adviser could and should have become a member of PBW Exchange. Had such memberships been secured, the Court of Appeals pointed to four areas in which recapture for the benefit of the Fund would have been possible:

A. As a member of NASD, the Adviser would have been entitled to give-ups of up to 40% of commissions on transactions executed on the PBW Exchange (533 F.2d at 750; reference was also made to a similar entitlement on Pacific Coast Exchange transactions, but plaintiffs do not here press any claim for damages in respect of the Pacific Coast Exchange);

B. As a member of PBW Exchange, the Adviser "could have received a substantial portion of commissions as an introducing broker, perhaps as much as 80%" (533 F.2d at 752);

C. As a member of PBW Exchange, the Adviser could also have obtained "PBW Exchange business from NYSE brokers in return for placing orders with them for execution on that exchange" (533 F.2d at 762; this would be a form of reciprocal arrangement); and

D. As a member of NASD, the Adviser would have been eligible to receive tender offer fees (533 F.2d 750; when a tender offer is made, the maker usually advertises an agreement to pay a fee to any NASD member named by a stockholder who tenders, the fee being a specified amount per share tendered and accepted).

It will be noted that recapture in areas A and B above could not both be obtained because this would be duplicative. If the Adviser were a member of the PBW Exchange and of NASD, recapture as a PBW Exchange member (area B) would be more advantageous for the Fund because the permitted percentage recapture would be higher.

The Court of Appeals, in giving guidance as to damages, ruled as to the period of time involved. The period of liability begins on March 1, 1967 (533 F.2d at 755). The period of liability for failure to recapture give-ups through membership in NASD ends on December 6, 1968, when give-ups were abolished by the stock exchanges (533 F.2d at 740, 755). The period of liability for failure to recapture through membership in the PBW Exchange ends on March 29, 1973, the effective date of Rule 19b–2 which made it essential for stock exchange members to conduct a "public business" of brokerage and thus abolished institutional recapture memberships (in this Court's earlier opinion the effective date of Rule 19b–2 was stated to be March 15, 1973 (383 F.Supp. 914 at 918 [D.C.]); this was an error; the Rule as promulgated in the Federal Register (38 Fed.Reg. 3928 (1973)) was stated to be effective March 15, 1973, but because of litigation this date was later postponed by SEC order to March 29, 1973). The period of liability for failure to recapture tender offer fees ends on the day of judgment unless this Court finds reason in the record to rule otherwise.

The Master found damages of $144,143.81 in area B; no damages in area C; and damages of $43,885.50 in area D.

In addition, the Master found damages of $184,730.30 in the area of "Underwriting Discounts, Commissions and Allowances".

From the total in damages of $372,759.61 thus found, the Master found that $34,-217.07 should be deducted as the expense which would have been incurred by membership in NASD and in the PBW Exchange. The net damages as found by the Master were thus $338,542.54. As a result of arithmetical errors (in one instance, per-haps a typographical error) by the Master (not noticed by the parties and so not brought to the attention of the Court), the Report (p. 17) expressed the figure as $349,-013.04.

The errors appear in Table 7 on page 17 of the Report. The figure shown in that Table for 1968 is "47,939.81". This figure is supposed to be the sum of $10,546.56 (Table 2) plus $1,200.00 (Table 3) plus $41,227.75 (Table 5) minus $5,505.00 (Table 6). The resulting figure should be $47,469.31. The figure shown in Table 7 for 1972 is "29,005.-75". This figure is supposed to be the sum of $16,424.30 (Table 2) plus $8,086.45 (Table 5) minus $5,505.00 (Table 6). The resulting figure should be $19,005.75.

The total of Table 7, representing the total damages found by the Master, should be $338,542.54.

4.

The Master first dealt with damages from failure of the Adviser to obtain membership in the PBW Exchange for itself or for an affiliate and to recapture "a substantial portion of commissions as an introducing broker" (533 F.2d at 752).

The Master found that between March 1, 1967 and March 29, 1973—the relevant period according to the Court of Appeals (533 F.2d at 755)—the Fund paid $180,179.77 in commissions on transactions effected for the Fund on the PBW exchange and that 80%, or $144,143.81, could have been recaptured by membership in the PBW Exchange. Had the Adviser been a PBW member, the executing broker on that Exchange could have shared commissions with the Adviser as an "introducing broker" member, a sharing not permitted with non-members. The Master found that 80% would have been the share to the Adviser for the benefit of the Fund.

The Master took note of testimony for defendants that the executing broker would retain more than 20%, but did not accept it. The Master noted that there was conflicting testimony and referred to the statement in Judge Friendly's opinion that the recapture could be of "a substantial portion of com-

missions as an introducing broker, perhaps as much as 80% . . . .". (533 F.2d at 752.) In the record before Judge Friendly there was testimony by the President of the PBW Exchange that an introducing broker would retain a percentage of the Commission and that "somewhere in the neighborhood of 80 per cent would be retained" (Stenographic Minutes of Trial p. 46). In *Papilsky v. Berndt*, CCH, Fed.Sec.L.Reptr. ¶ 95,627 (S.D.N.Y.1976), Judge Frankel noted: "Mr. Elkins Wetherill, President of the PBW, testified that introducing brokers would negotiate to keep up to 80% of the commission".

The only discussion by defendants in this Court of this element of damages, so far as I can find, is this statement on page 13 of an undated, unfiled memorandum:

"As to gross commissions charged the Fund on PBW over seven years (Table 1) of $180,179.77, only the amount of give-ups directed to be paid to non-executing brokers of about 30% thereof should be taken into account."

This comment seems to miss the point entirely. What the defendants and the executing brokers may have decided to give up to others is irrelevant. The only relevant inquiry is what percentage of total commissions paid by the Fund on PBW transactions could have been recaptured for the Fund had the Adviser been a PBW member.

The Master was justified in allowing as an element of damages $144,143.81, the amount which "would have been" available for recapture through membership in the PBW Exchange. This is approved.

5.

The opinion of the Court of Appeals states that had the Fund secured NASD membership "it would have been entitled . . . to tender offer fees." (533 F.2d at 750). A footnote added this explanation: "The maker of a tender offer frequently agrees to pay a fee to any NASD member named by the tendering shareholder."

The Master found that the Fund had "paid tender offer fees" in the amount of $43,885.50 (Report, p. 8) and since these could have been recaptured (or captured)

for the Fund, awarded this amount as damages. (The Master, as will be seen, is mistaken in saying that the *Fund* paid any tender offer fees.)

The evidence fully supports the finding of the Master. Exhibit 100 was prepared by defendants and includes the amount of "tender fees" as found by the Master; Exhibit 100 was offered by plaintiffs and received without objection by defendants on grounds of accuracy (SM 112; "SM" references herein are to pages of the stenographic minutes of the hearing before the Master). The terminology employed by the Master is somewhat inaccurate. Tender offer fees were not "paid" by the Fund; they were "paid" by the corporation making the offer to buy stock tendered; they were paid to any NASD member named by the tendering stockholder. The reason for the payment was that the offeror, the would-be purchaser of stock, was anxious to have as many shares tendered as possible. To encourage brokers to solicit tenders of stock, the offeror agreed to pay a stated amount per share to the NASD member broker-dealers named by the tendering stockholder. This was explained in Judge Friendly's opinion and in this record by the expert witness for plaintiffs (SM 109–112). The amounts shown as "tender fees" in Exhibit 100 are evidently the amounts which would have been payable in respect of tenders made by the Fund or amounts actually paid in respect of such tenders by the offerors to NASD members designated by the Fund as rewards (similar to the give-up rewards).

So far as I can find, the only comment for defendants on this topic to this Court, is this statement on page 13 of an undated, unfiled memorandum:

"As to the item of 'tender offer fees' (Table 3), only the single item of $3000 in 1974 occurred after SEC Release No. 10,-102 in the year 1973. Thus, in accordance with the mandate, this sum can be taken into account."

Apparently, this is an attempt to argue that only damages after the date of the cited SEC Release No. 10,102 (April 12, 1973) are

recoverable. If this be the argument, it is without merit. The cited SEC Release No. 10,102 referred to the *withdrawal* of a proposal by the SEC (made in Release No. 990, published December 27, 1972) to eliminate the payment of tender fees to an NASD affiliate of a big investment fund. In oral argument, counsel for defendants asserted (SM 90–91) that the SEC "had taken the position—indeed, I think in December of 1972 it took the flat position in Release No. 9902 [should be "9920"], . . . that any attempted recapture of a tender offer was illegal and in violation of the Williams Act." This assertion is in error. The SEC took no such position, did not mention illegality, and did not mention the Williams Act. In Release No. 9920 the SEC merely *proposed* a change in a Rule, which change was *withdrawn* by Release No. 10,102.

Judge Friendly cited (533 F.2d at 752) Release No. 10,102 to show SEC recognition (a) that an affiliate of an investment fund could become a member of NASD and (b) that there may be an obligation on such investment fund to recapture tender fees through an NASD affiliate. The citation has no slightest bearing on the time period during which the duty to recapture existed. That time period was elsewhere (533 F.2d at 755) fixed in the opinion at March 1, 1967 to the "day of judgment" subject to a discretion of this Court to consider a shorter period. The Master properly ended the period on the "day of judgment".

The Master's finding on this item is approved.

### 6.

Under the heading "Underwriting Discounts, Commissions and Allowances", the Master awarded damages in the sum of $184,730.30 (Report, p. 13). The Master found that this sum could have been recaptured as underwriting discounts or commissions, had the Adviser secured membership in NASD.

A principle found in the opinion of the Court of Appeals is in substance that the Adviser was under a fiduciary duty to become a member of NASD, either itself or by a subsidiary, and to recapture for the Fund whatever could be recaptured by a member of NASD. The Court of Appeals referred specifically, as some of the recapture opportunities through NASD membership, to the following: give-ups on the PBW and Pacific Coast Exchanges, discounts of 25% on the Pacific Coast Exchanges, and tender offer fees (533 F.2d at 750). The Court of Appeals did not refer specifically to underwriting discounts, but certainly could not have meant to exclude these as an element of damages, if established.

Between the date of the Court of Appeals opinion (December 30, 1975) and the date of the Master's Report (October 31, 1978) there had been filed on June 24, 1976, the opinion of Judge Frankel deciding *Papilsky v. Berndt*, cited above. Judge Frankel, after an extensive discussion, decided (among other things) that "recapture of underwriting fees" by an NASD member who was adviser to a big investment fund "was available and legal".

Shares are sold on stock exchanges through commission brokers by shareholders who own the stock, which has been already issued; the issuing corporation has nothing to do with sales on stock exchanges. However, when a big corporation wishes to raise money for itself, by selling new shares to the public, either when it begins business or later, it usually sells the new shares to an investment banker who resells to the public at a public offering price. The purchaser investment banker is called the lead underwriter. The lead underwriter does not usually act alone; he forms an "underwriting syndicate" of a number of investment bankers who each agree to be responsible for a part of the underwriting obligation, that is, for the sale of a certain number of shares. Another group is organized, called the "selling group". These are the broker-dealers who make the actual retail sales of the shares. A member of the underwriting syndicate may also be a member of the selling group; there may be many members of the selling group who are not members of the underwriting syndicate. The profit of the lead underwriter, of the members of

**1198**

the underwriting syndicate, and of the members of the selling group comes from the difference between the agreed price to the issuer and the public offering price, often called the "gross spread". The lead underwriter receives a management fee in an agreed amount per share; the members of the underwriting syndicate receive an "underwriting discount" or underwriting fee in an agreed amount per share; and the members of the selling group receive a "commission" or selling fee in an agreed amount per share sold by them at retail. Only members of NASD are eligible to become members of the underwriting syndicate or of the selling group. For a general description of the public offering-underwriting process, see R. Jennings & H. Marsh, Securities Regulation pp. 19–28 (4th ed. 1977).

There is a similar type of underwriting when the seller of the shares is not the issuer corporation but a large holder of shares of that corporation, shares already issued. These sales are made, for example, by the estate of a very large shareholder or by any holder of a very large number of shares—so many that an underwritten public offering is more advantageous than an attempt to sell on the stock exchanges. These offerings are called "secondary distributions" or, in shortened form, "secondaries". The methods and terminology of the underwriting are the same for secondaries as for the new issues, already described.

Since investment funds purchase shares in large amounts, the lead underwriter and the other participants eagerly solicit their business. Just as in the case of brokerage commissions, they were willing to give to an investment fund a part of their gross spread, underwriting discounts, commissions or fees—using the terminology already described—in return for the large volume purchase order of the fund. The method by which this was done, as found by Judge Frankel in *Papilsky v. Berndt*, above cited, was for the lead underwriter to agree with a fund that as a purchaser it "could designate members of the underwriting or selling group to participate in the sales commissions. The underwriters would even

include additional NASD members in the underwriting or selling group at the fund's request in order to permit them to receive commissions". In *Papilsky v. Berndt*, Judge Frankel found the defendants liable for failure to recapture underwriting discounts and commissions by designating the fund adviser, an NASD member, as a member of the underwriting syndicates and selling groups.

In the case at bar, had the Adviser been so designated with the agreement of the syndicate or group, or both, the Adviser could have shared in the $738,921 "underwriting discounts" shown on Exhibit 100, just as in the case of a brokerage commission. It is not possible to learn from the evidence how much of the $738,921 figure was paid out by the underwriting syndicates to firms designated by the Adviser as a reward for assisting in the sale of Fund shares.

The Master, correctly in my view, adopted the same theory as Judge Frankel in awarding damages in this area.

The defendants in the case at bar knew of the recapture possibilities in this area, but as in the case of give-ups in general, preferred to use these advantages to reward broker-dealers who conferred benefits on the Adviser rather than to secure some benefit for the stockholders of the Fund. Defendant Greene testified that the Fund orders were "larger than normal" and "a larger transaction" (SM 1096) and that the Adviser telephoned the lead underwriter and designated "other underwriting firms in the group"; these were "very definitely" designated "on the basis of their assistance in the sale of fund shares" (SM 1096). The Master correctly reasoned that, had the Adviser secured NASD membership, it could have designated itself to share in the underwriting discount or commissions.

The evidence (principally Exhibit 100) shows that on the shares purchased by the Fund as new issues or secondaries from underwriting syndicate-selling groups, the purchase price paid by the Fund included $738,921 in "underwriting discounts". This

amount was calculated by the defendants by multiplying the number of shares bought by the Fund "by the amount of the underwriting discount per share" (letter from counsel for defendants, dated June 13, 1980). "Underwriting discount" as used in this letter is taken to be the same as "gross spread" earlier referred to—the difference between the price paid to the issuer and the public offering price.

The Master found that at least 25% of the $738,921 in "underwriting discounts" shown on Exhibit 100 could have been recaptured for the Fund had the Adviser become a member of NASD and had the Adviser used the large volume purchases of the Fund as leverage to come to an agreement with the lead underwriter to designate the Adviser as a member of the underwriting syndicate or selling group and to share in the discounts or commissions, or both. The damage award of the Master was $184,730.30.

While this finding of the Master can be justified on the evidence, it is more conservative to use a figure for recapture of 20%. This takes into account that on a public offering—whether new issue or secondary—there is considerable expense involved to the underwriting syndicate; there are counsel fees, advertising, printing of the prospectus, registration statement, etc. In addition, there is the risk that the issue may not sell and that the underwriters will have unsold shares on their hands with a falling market value. These factors might cause the underwriting syndicate to resist a 25% share to the Adviser. The 20% figure seems to me well within the bounds of reason and is certainly not high or too favorable to the plaintiffs. It will be used.

Applying the 20% to the $738,921 yields the amount of $147,784 which will be the damage award on this aspect of the claim of plaintiffs.

### 7.

The principal claim made by plaintiffs was for the amount which could have been recaptured had the Adviser or a subsidiary thereof secured membership in the PBW Exchange and obtained reciprocal brokerage on that Exchange from members of NYSE and Amex to whom Fund transactions on those exchanges were entrusted by the Adviser and which transactions produced substantial commissions to the NYSE and Amex brokers.

This method of recapture was already developed and in use by others during the relevant period. It was based on membership by the adviser in the PBW Exchange or some other regional exchange; it was not necessary for membership in the PBW Exchange, as it was for membership in NYSE and Amex, to be a broker-dealer offering services to the public. An investment adviser could be a member of the PBW Exchange. Brokerage commissions could be shared between members of the PBW Exchange as they could be shared between members of the NYSE and Amex; an adviser, however, as just noted, could not be a member of NYSE or Amex. It has already been seen, in connection with Fund transactions on the PBW Exchange, how up to 80% of the commissions could have been given to an adviser member of PBW as an "introducing broker". In return for the large volume of Fund transactions directed to brokers on NYSE and Amex, it could have been arranged with those brokers that *their* commissions on PBW Exchange be shared with Chestnutt Corp. (as Adviser to the Fund, and a PBW member) in an agreed percentage of commissions on Fund transactions executed by them on NYSE and Amex. A portion of NYSE and Amex commissions paid by the Fund could thus have been recaptured, could have been credited against the advisory fee charged by the Adviser, and could have inured to the benefit of the stockholders of the Fund.

As I read its opinion, the Court of Appeals approved this method of recapture and indicated clearly that it should figure in the calculation of damages.

The Court of Appeals noted (533 F.2d at 736):

Meanwhile a few adviser-underwriters decided to recapture for their funds some of the spread between the fixed and unvarying commissions payable to executing brokers and the lesser amounts the

latter were willing to accept on large orders.

In this connection, the Court of Appeals then quoted, with evident approval, from a Report of the SEC, Public Policy Implications of Investment Company Growth, House Report No. 2337, 89th Cong., 2d Sess., including the following (533 F.2d at 736; emphasis supplied):

(a) Use of brokerage commissions to benefit the funds

(i) Reducing advisory fees.—As has been noted, subsidiaries of four adviser-underwriters that maintain their own retail sales forces—among them three of the largest, Investors Diversified Services, Inc., Waddell & Reed, Inc. and Channing Financial Corp., as well as the smaller Imperial Financial Services, Inc.—are now members of the Pacific Coast Stock Exchange. These subsidiaries execute orders for the funds on the Pacific Coast Stock Exchange. *More important, however, they obtain a considerable amount of nonfund business from broker-dealers who are dual members of the Pacific Coast Stock Exchange and other exchanges in return for fund brokerage business on other exchanges, primarily the NYSE.* All the net profits of IDS's subsidiary and about 40 to 50 percent of the net profits of Waddell & Reed's and of Imperial Financial Services' subsidiaries have been applied to reduce advisory fees payable by the funds in those complexes.

Widespread emulation by institutional investors of the precedent set by these four complexes could have a marked effect on the economies of the securities industry. Within the framework of the existing commission rate structure it is a method whereby mutual fund shareholders can derive greater benefits than they have heretofore received from fund brokerage commissions.

The Court of Appeals later quoted, again with evident approval, from a letter of the General Counsel to the SEC, including the following (533 F.2d at 741; emphasis supplied):

As you suggest, the statements in letters from the Commission to stock exchanges in connection with their adoption of rules abolishing the customer-directed give-ups, that the Commission understood that these rules were not designed to terminate procedures whereby institutions may obtain returns of commissions merely reflected, in our view, that *the exchange rules with respect to customer-directed give-ups did not,* and were not intended to, *terminate the existing arrangements which a few mutual fund organizations have made for the indirect recapture of a portion of their commissions.* It is my understanding that this is not presently accomplished by means of customer-directed give-ups, which have been abolished, but in other ways, *primarily by reciprocal practices.* If these reciprocal practices are available to fund managements, it did not seem appropriate to foreclose their use to benefit the fund itself.

It should be understood, however, that if mutual fund management does acquire a seat on a regional stock exchange whose rules permit the recapture of commissions paid by the fund through the use of that seat, there may be circumstances under which such recapture could be required and that the management may not be free to simply retain for itself revenues derived from this source. This is particularly likely to be true where the affiliate on the exchange does not execute or clear transactions for the account of the fund, but *merely receives revenue from other brokers, which revenue is attributable to transactions executed for the account of the fund by such other brokers.* . . .

Finally, the Court of Appeals addressed itself directly to the item of damages now under discussion. The Court of Appeals said (533 F.2d at 752; emphasis supplied):

However, the testimony of Elkins Wetherill, president of the PBW Exchange, was unequivocal that an affiliate of the Adviser could have become a member of the PBW Exchange. As such it could have

received a substantial portion of commissions as an introducing broker, perhaps as much as 80%, and could have credited these against the advisory fee. At least until the abolition of reciprocals on July 15, 1973, *the member could also obtain PBW Exchange business from NYSE brokers in return for placing orders with them for execution on that exchange.* An exhibit showed that on March 5, 1973, PBW had 49 institutional members, including some nine who appear to have been affiliates of advisers or distributors of mutual funds.

Parenthetically, it may be noted that after the decision of the Court of Appeals and before the Report of the Master, Judge Frankel, in *Papilsky v. Berndt,* cited above, recognized the same item of damages now under discussion. After quoting a part of the PBW Constitution, Judge Frankel stated:

"The evidence is clear, however, that this provision was not construed by the Exchange to prevent use of an affiliate which would be entitled to obtain membership on the PBW Exchange in order to act as an introducing broker for Affiliated Fund."

A footnote then continued:

"In addition, such an affiliate could have obtained PBW Exchange business from NYSE brokers who wished a transaction executed on the PBW Exchange in return for placing orders with these brokers for execution on the NYSE."

The Master nevertheless declined to award any damages in this area. I am satisfied that in so declining, the able Master was in error.

The Report of the Master first concluded (p. 9) that any demand "to share commissions entailed considerable risks due to the delicately balanced financial and psychological factors inherent in the bargaining process of the securities market." I cannot find any evidence which would support this conclusion. It seems clear that the system of fixed brokerage commissions, regardless of the number of shares or dollars involved, produced a substantial amount of "fat" which the executing brokers were willing to share in order to secure the large volume of investment funds.

The Master also concluded (Report, p. 9) that "possibilities for recapture appear to have been far fewer than plaintiffs contend." The evidence does not support this conclusion; on the contrary, the Court of Appeals decided on the evidence at trial that there could have been such recapture; so also did Judge Frankel in a similar case; and the expert (and only) witness for plaintiffs testified without contradiction that in fact he had done it.

The Master noted that although PBW Exchange was using possible recapture as an inducement to secure memberships, relatively few investment firms attempted recapture. The Master inferred from this that the arguments for the "potential for recapture are overly optimistic" (Report, p. 9). With great respect for the views of the Master, I feel that no such inference is justified. On the contrary, the more logical inference is that the reason recapture in this area was attempted by relatively few investment funds was because of the selfish and conflicting interests of their advisers which, as in the case of the Adviser here, followed age-old patterns of human nature and preferred to use the "fat" in the NYSE and Amex commissions for their own benefit rather than for the benefit of the funds. In point of fact, there were a number of large and prominent mutual funds whose advisers were recapturing brokerage commissions for the benefit of their funds. The SEC Report, quoted above and in the Court of Appeals opinion, mentions Investors Diversified Services (IDS), Waddell & Reed, Channing Financial Corp. and Imperial Financial Services. The witness for plaintiffs mentioned, in addition, Dreyfus Corp. (SM 62–63.)

The Master specifically based his refusal to find damages in this area on the failure of the expert witness for plaintiffs to "ana-

lyze the Fund's trading figures in detail to arrive at a reasonably precise proportion of recapturable trade commissions." (Report, p. 9.) The Master found that plaintiffs did not carry a burden "to elicit from their witness the detailed basis of his analysis, if there was any". (Report, p. 10.) I do not believe that any such "detail" or a "detailed analysis" of the Fund's "trading figures" would be meaningful. It is the total yearly volume of Fund commissions on NYSE and Amex transactions which is significant. This was in evidence and was used by the expert witness in arriving at his opinion.

The expert witness for plaintiffs was Jones, the President of the brokerage firm which was a wholly owned subsidiary of Waddell & Reed, one of the recapturing investment advisers mentioned approvingly in the SEC Report quoted in the opinion of the Court of Appeals. The job of the witness had been to recapture as much as possible of the brokerage commissions paid for stock transactions by the investment funds advised by Waddell & Reed. He worked at this job successfully for a number of years and, with his extensive background experience added in, was uniquely qualified to testify on damages in the case at bar. The Master correctly found that he could testify as an expert (SM 53; Fed. R.Ev. 702).

Before doing so, Jones told how Waddell & Reed secured, through its subsidiary, reciprocal brokerage from the brokers employed on NYSE. More than half the transactions of the funds advised by Waddell & Reed were on the NYSE. The subsidiary was a member of three regional exchanges—PBW Exchange, Midwest Exchange, and Pacific Coast Exchange. Some 50 brokers were employed by Waddell & Reed to execute transactions for their funds on NYSE. Jones arranged with them that they, in exchange for the NYSE business, would share with the Waddell & Reed subsidiary their own commissions on PBW Exchange and the other regional exchanges of which the subsidiary was a member. They were entirely agreeable to doing this, obvi-

ously because under the no volume discount-no fixed minimum commission rules, there was sufficient "fat" in their NYSE commissions to make it profitable for them to do so.

In 1968, most of the reciprocal brokerage was done "two for one" (SM 33), meaning that for every $1,000 in commissions for fund transactions executed on NYSE, the fund affiliated member of a regional exchange (such as PBW) was given $500 in shared commissions on that regional exchange. Beginning in 1969, the share of the Waddell & Reed fund affiliate increased and in 1970 and thereafter was 75%, or $750 in shared commissions on a regional exchange for $1,000 in commissions on NYSE.

The evidence, in particular Exhibit 96, showed that in the relevant time period, the Waddell & Reed funds paid $114,474,000 in brokerage commissions on all exchanges and that $47,917,000, or about 42%, was recaptured.

Based on the opinion of the Court of Appeals and the evidence before the Master, damages must be awarded for failure of defendants to recapture through reciprocal brokerage. The amount is to be determined.

Jones was of the opinion that there could have been recovered for the Fund by way of reciprocal brokerage, approximately $3,250,000. He explained that out of the total commissions paid by the Fund, the executing brokers would keep 40% for their own expenses, including research, and that this would leave 60% as the maximum subject to recapture. Since the industry practice was to share for recapture on at least a two-for-one basis, one dollar surrendered by the executing broker for each two dollars in commissions, this meant that of the 60%, half or 30% would be the part recapturable by the Fund here.

According to Jones: "typical of the industry was a two for one deal" (SM 61). Any fund having at least $10,000 in brokerage commissions annually on its NYSE transactions could, according to Jones, have

secured the two-for-one reciprocal brokerage recapture.

Applying 30%, the percentage obtained by the use of the two-for-one formula as shown above, to the total commissions paid by the Fund—after eliminating underwriter discounts, about which Jones said he knew nothing—the result was the $3,250,000 already given as the opinion of Jones. It was stated by Jones that his opinion was "conservative" (SM 118) and lower than what he was recapturing for Waddell & Reed. Jones explained that there would be no expense involved in recapture and no necessity for the Fund PBW member to do anything except receive a "clearance ticket", what he called "a Philadelphia give-up" (SM 115).

The 30 percentage stated in the opinion of Jones as the percentage of total commissions which could have been recaptured for the Fund is justified by the evidence, including the other testimony of Jones. The dollar amount stated by him is subject to some adjustment for minor mistakes appearing on close examination of the figures in the record. The total Fund commission, as given to Jones from Exhibit 100, was $11,597,728.95 (SM 113). The figure has at least two errors: (a) it includes commissions on *all* exchanges whereas the only relevant commissions are those on NYSE and Amex; and (b) it includes underwriting discounts and tender fees which are not brokerage commissions and are not involved in the item here under consideration.

A figure of 20% as the recapturable percentage of NYSE and Amex commissions is a more conservative figure and will be adopted. Waddell & Reed were able to recapture 42% of the total commissions. The amount of their commissions was much larger than that of the Fund here. It is true that the evidence, including the testimony of Jones, establishes that the recapturable percentage did not increase in proportion to an increase in the amount of commissions. Among other evidence, this appears from a comparison of the yearly total commissions of the Waddell & Reed funds set out in Exhibit 96 with the percentage recaptured in each year. For example, the highest percentage of recovery is 57.6% in 1970 when the total commissions in that year were sixth in size for the eight years involved.

While the 20% amount may be to some extent unfair to plaintiffs, it avoids any possibility that the damages are fixed in an amount greater than could have been obtained by the defendants through recapture.

The starting figure for calculating damages in this area is the amount of commissions paid by the Fund in the relevant time period for the execution of its transactions on the NYSE and Amex. These are shown on Exhibit 100 by the three figures (disregarding cents)—$1,805,341; $2,462,562; and $6,075,951—appearing in the "Totals" column on the extreme right of the exhibit. The grand total of these commissions is $10,343,854. Applying to this grand total the 20% recapturable factor yields the amount of $2,068,770 which is the damage award on this aspect of the claim of plaintiffs.

8.

The arguments for defendants, both oral and written, have each been carefully considered and must each be rejected as without merit. It would serve no useful purpose to discuss any of those arguments except one.

The principal argument for defendants is that on the evidence the Fund was much better off not recapturing than to have recaptured. I do not believe that, as a matter of law, this Court can entertain such an argument. It seems to me simply a repeat of the "business judgment defense" which was "foreclosed on the issue of liability because of lack of effective disclosure to unaffiliated directors" (533 F.2d at 756). It is an attempt to reargue in this Court the decision of the Court of Appeals.

Could I consider the argument, it could not be found supported by the evidence. There is nothing in the record to show that there would have been any detriment what-

ever to the Fund had the Adviser recaptured for the Fund what could easily have been obtained. The defendants were motivated in making no effort to recapture, by a desire to advance their own interests and not by a desire to serve the interests of the Fund.

### 9.

The Master correctly allowed as an offset what it would have cost to qualify the Adviser as a member of PBW Exchange and of NASD (Report, pp. 15, 16).

### 10.

The Master correctly found (Report, p. 4) that no evidence would justify a distinction between the defendants as to the extent of their liability. The judgment will be against all of the defendants in the same amount.

### 11.

The amount of the judgment will be the aggregate of the separate sums above determined, less the amount of the offset allowed by the Master. (Cents will be disregarded.)

The damages by year from failing to recapture introducing broker commissions through membership in PBW Exchange are shown in the Master's Report (p. 7) in Table 2.

The damages by year from failing to recapture tender offer fees are shown in the Master's Report (p. 8) in Table 3.

The offsets allowed by the Master are shown by years in the Master's Report (p. 16) in Table 6.

Because this Court has reduced the damages allowed by the Master from failing to recapture "underwriting discounts", these must be recalculated by years. According to my calculations, the damages on this item are by years as follows:

| | |
|---|---|
| 1967 | $ 4,377 |
| 1968 | 32,982 |
| 1969 | 80,861 |
| 1970 | 16,273 |
| 1971 | 5,095 |
| 1972 | 6,469 |
| 1973 | 1,724 |
| | $147,781 |

(Because cents have been disregarded, there is a small difference between this total figure shown above and the total stated in section 6 of this opinion.)

Since the Master did not allow damages from failing to recapture reciprocal commissions, it is necessary to calculate these by years. According to my calculations, the damages on this item are by years as follows:

| | |
|---|---|
| 1967 | $ 274,664 |
| 1968 | 498,741 |
| 1969 | 426,630 |
| 1970 | 374,691 |
| 1971 | 310,433 |
| 1972 | 154,066 |
| 1973 | 29,541 |
| | $2,068,766 |

(Because cents have been disregarded, there is a small difference between this total figure shown above and the total stated in section 7 of this opinion.)

The total damages by years after allowing for offsets are calculated as follows:

| | |
|---|---|
| 1967 | $ 306,196 |
| 1968 | 537,964 |
| 1969 | 559,330 |
| 1970 | 424,616 |
| 1971 | 337,546 |
| 1972 | 171,454 |
| 1973 | 30,531 |
| 1974 | 2,720 |
| | $2,370,357 |

Subject to correction for arithmetical errors in my calculations (and counsel are asked to verify these), judgment will be entered in favor of American Investors Fund, Inc. and against defendants, Chestnutt Corporation, Chestnutt, Jr., Sabel, Greene, and Currier in the sum of $2,370,-357.

Interest is allowed on damages from the end of each year; the amount of damages will be accumulated as of the end of each year; the interest will be at the legal rate in effect at the end of each year except that after the end of the year 1974 interest will be at the legal rate in effect from time to time.

Counsel should be able to agree on the form of judgment. If agreement is not

possible, proposed forms of judgment should be submitted at my chambers in Room 2903 not later than 11 a. m. on Thursday, June 26, 1980.